MARC CROWN, trustee,[1] vs. KOBRICK OFFSHORE FUND, LTD., & others.[2]

No. 13-P-64.

Suffolk. December 6, 2013. - April 24, 2014.

Present: FECTEAU, SULLIVAN, & MALDONADO, JJ.

*Uniform Securities Act. Securities,* Sale. *Consumer Protection Act,* Securities transactions. *Practice, Civil,* Instructions to jury, Judgment notwithstanding verdict, Summary judgment, Attorney's fees. *Evidence,* Impeachment of credibility, Cross-examination, Expert opinion, Qualification of expert witness. *Witness,* Impeachment, Cross-examination, Expert. *Contract,* Indemnity. *Indemnity. Public Policy.*

In a civil action alleging, inter alia, misrepresentation by a "hedge" fund and its manager (defendants), under the Massachusetts Uniform Securities Act, G. L. c. 110A, § 410(*a*)(20), there was no abuse of discretion or error in the admission of evidence of the investment experience of the plaintiff trustee of a profit sharing plan, the plan's other investments, or the hedge fund's investment style [219-221]; further, there was no merit to the plaintiff's claim that the judge precluded the testimony of his expert witness, but in any event, preclusion of the witness would not have constituted an abuse of discretion or error [222-223]; moreover, the judge correctly instructed the jury concerning the plaintiff's actual knowledge of the falsity of any misrepresentation [223], and error, if any, in the judge's declining to instruct the jury concerning the plaintiff's sophistication as an investor was not prejudicial [223-224]; finally, the jury's finding that the defendants had made no misrepresentation and their verdict for the defendants were well supported by the evidence [221-222].

In a civil action alleging, inter alia, unfair and deceptive trade practices by a "hedge" fund and its manager (defendants) under G. L. c. 93A, § 11, there was no clear error in the judge's declining to credit the testimony of the plaintiff trustee of a profit sharing plan or in the judge's findings that the

─────────────

[1] Of the Geo-Centers, Inc. Profit Sharing Plan and Trust (plan). Edward Marram was the trustee of the plan at the time of the events in this case. Marram was the primary beneficiary of the plan and had originally filed this suit as trustee. Sometime after trial, Joseph Walkush was substituted for Marram as trustee of the plan. Thereafter, Marc Crown was substituted for Walkush. Because Marram initiated this suit as trustee and his actions on behalf on the plan are at issue, our focus is necessarily on his actions.

[2] Kobrick Capital Management, LLC, and Frederick R. Kobrick.

defendants made no preinvestment or postinvestment misrepresentations; accordingly, the judge's ruling for the defendants was supported by the evidence. [224-226]

In a civil action arising from an investment by the plaintiff trustee of a profit sharing plan in a "hedge" fund, a Superior Court judge properly granted summary judgment in favor of the plaintiff on the defendants' counterclaim that sought recovery of legal fees under two subsections of an indemnification clause in the subscription agreement, where the counterclaim based on the first subsection (i.e., the plaintiff's claim of oral misrepresentations) was in direct conflict with a prior decision of the Supreme Judicial Court in the same case that had allowed the plaintiff's claim to proceed [226-228], and where the judge correctly concluded that the counterclaim based on the second subsection (seeking to hold the plaintiff liable for the defendants' legal fees arising out of any action for securities law violations) was unenforceable as against public policy [228-233].

CIVIL ACTION commenced in the Superior Court Department on June 21, 2001.

After review by the Supreme Judicial Court, 442 Mass. 43 (2004), a motion for summary judgment was heard by *Ralph D. Gants*, J.; the case was tried before *Margaret R. Hinkle*, J., and motions for judgment notwithstanding the verdict, for a new trial, and to alter or amend the findings were considered by her.

*Philip Y. Brown* (*Stacie A. Kosinski* with him) for the plaintiff.

*Jeffrey S. Robbins* for the defendants.

FECTEAU, J. This cross appeal involves the plaintiff's claim under the Massachusetts Uniform Securities Act (securities act) for misrepresentation, G. L. c. 110A, § 410(a)(2), tried to a jury, and a claim for unfair and deceptive trade practices, G. L. c. 93A, § 11, tried to a judge; both trials resulted in a judgment for the defendants. On appeal from the judgment and the denial of three posttrial motions, the plaintiff challenges a number of evidentiary rulings, the jury instructions, and the sufficiency of the evidence. In their cross appeal from the judgment, the defendants challenge the allowance of the plaintiff's motion for summary judgment that dismissed their counterclaim for breach of contract.

We discern no abuse of discretion or other error in the evidentiary rulings or jury instructions challenged by the plaintiff, and we see no merit in the plaintiff's argument that the evidence was insufficient. As to the defendants' claim on appeal, we

conclude that summary judgment was properly entered because the ground for the defendants' counterclaim is irreconcilable with the Supreme Judicial Court's decision in a related case, *Marram* v. *Kobrick Offshore Fund, Ltd.*, 442 Mass. 43 (2004) (*Marram I*). Accordingly, we affirm the judgment and the orders denying the plaintiff's posttrial motions.

*Background.* 1. *Procedural history.* This dispute arises from the plaintiff's investment in the Kobrick Offshore Fund (fund), which was a "hedge" fund[3] founded and managed by Frederick R. Kobrick (Kobrick). In particular, the parties' dispute centers on a December, 1999, meeting, and the statements Edward Marram and Kobrick made then and shortly thereafter in connection with Marram's decision to invest in the fund on behalf of the Geo-Centers, Inc. Profit Sharing Plan and Trust (plan).

In June, 2001, Marram, as trustee for the plan, sued the defendants for misrepresentation under the securities act, G. L. c. 110A, § 410(*a*)(2) (securities claim); negligent misrepresentation; and unfair and deceptive trade practices, G. L. c. 93A, § 11 (c. 93A claim). In December, 2002, a Superior Court judge dismissed the plaintiff's claims on the defendants' motion pursuant to Mass.R.Civ.P. 12(b)(6), 365 Mass. 754 (1974). The plaintiff appealed, and the Supreme Judicial Court vacated the dismissal of the plaintiff's complaint and remanded the case to the Superior Court. See *Marram I, supra* at 63.

On remand, two claims were dismissed before trial proceedings began. A judge granted the plaintiff's motion for summary judgment on the defendants' breach of contract counterclaim that sought legal fees under an indemnification clause in the parties' subscription agreement. The motion judge concluded that the indemnification clause was unenforceable as against public policy. In addition, the plaintiff dismissed its negligent misrepresentation claim. The plaintiff's remaining two claims were bifurcated for trial.

A jury trial was conducted on the plaintiff's securities claim from November 16 to November 30, 2009. The jury found for

_____

[3]A "hedge" fund is "a specialized investment group — [usually] organized as a limited partnership or offshore investment company — that offers the possibility of high returns through risky techniques such as selling short or buying derivatives." Black's Law Dictionary 727 (9th ed. 2009).

the defendants, answering a special verdict question that the defendants had made no misrepresentations. After a two-day bench trial conducted shortly thereafter, the judge made findings on the plaintiff's c. 93A claim, similarly concluding that the defendants had made no misrepresentations and committed no unfair or deceptive trade practices. After judgment entered, the plaintiff filed a series of posttrial motions: a motion for new trial, Mass.R.Civ.P. 59, 365 Mass. 827 (1974); a motion to alter or amend the findings, Mass.R.Civ.P. 52(b), as amended, 423 Mass. 1402 (1996);[4] and a motion for judgment notwithstanding the verdict, Mass.R.Civ.P. 50(b), as amended, 428 Mass. 1402 (1998).[5] The trial judge denied all "for the reasons set forth in the opposition." Both the plaintiff and the defendants appealed.

2. *Trial evidence.* During trial, there was evidence of the following. On December 17, 1999, Marram met with Kobrick to discuss investing some of the plan's assets in the fund. As the basis of the misrepresentation claim, Marram testified that during this meeting Kobrick stated: (i) the fund was a suitable investment for the plan; (ii) the fund was diversified and invested in a variety of industries; (iii) the stock of high technology companies did not constitute a majority of the fund's holdings; and (iv) the fund would not be a volatile investment. The defendants denied that any such statements were made and countered with evidence that directly refuted the plaintiff's claims. For example, Kobrick's "PowerPoint" presentation at the December,

[4]The plaintiff's motion to alter or amend the findings concerned the judge's decision on the plaintiff's c. 93A claim.

[5]The judge denied the plaintiff's motion for judgment notwithstanding the verdict (JNOV) for the reasons stated in the defendants' opposition, which correctly asserted that the issues raised in the JNOV motion were waived by the plaintiff having failed to present them specifically in its directed verdict motion. See *Bonofiglio* v. *Commercial Union Ins. Co.*, 411 Mass. 31, 34-36 (1991) (trial judge properly denied JNOV motion, where prior directed verdict motion failed to specify any grounds); *Shafir* v. *Steele*, 431 Mass. 365, 371 (2000) ("a party may not raise an issue in a motion for [JNOV] that was not raised in a motion for directed verdict"). Even if the plaintiff's motion was not waived, the plaintiff has failed to meet his burden. See *O'Brien* v. *Pearson*, 449 Mass. 377, 383 (2007) (noting that a denial of a motion for JNOV must be upheld if "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be made in favor of the [nonmovant]" [citation omitted]).

1999, meeting stated that the fund had a "capital appreciation" objective and "focus[ed] on high growth stock/sectors." Moreover, after the meeting, Kobrick arranged for the plan to receive the fund's confidential offering memorandum (offering memorandum), which disclosed among other things, that the fund was "SPECULATIVE," involved a "HIGH DEGREE OF RISK," and was designed to achieve "above market growth." The offering memorandum also stated that the fund: lacked diversification guidelines; may invest a significant proportion of its assets in "higher growth industries, such as technology [and] telecommunications"; and could engage in risky investment techniques. Marram signed the subscription agreement, certifying that he had read and understood the offering memorandum, and that he was knowledgeable and experienced in financial and business matters.

Marram invested $1.5 million of the plan's assets in the fund on January 1, 2000. On March 1, 2000, Marram invested another $500,000. Soon thereafter, the stock market suffered a sharp drop and the value of the fund declined significantly. Again, the evidence showed that the parties further disputed the course of their dealings in 2000 after this market decline. The plaintiff asserted through Marram's testimony, in effect, that Kobrick made several postinvestment misrepresentations to induce the plan to keep its assets invested in the fund, specifically, that Kobrick had made the following false statements: (i) "new" money was coming into the fund; (ii) the new money was primarily from other Employee Retirement Income Security Act (ERISA) investors; and (iii) the fund had sold most of its technology holdings and shorted quite a bit more in March, 2000. Additionally, Marram testified that Kobrick failed to respond to Marram's request for a detailed listing of all the fund's positions.

The defendants demonstrated through evidence, however, that "[t]he [plaintiff] offered no credible evidence that any statement made by [the defendants] had any material impact on the [plaintiff's] decision to remain invested in the Fund . . . [and] the [plaintiff] remained invested in the Fund through April 2001 because of its hope that the stock market would rebound."

Ultimately, on May 7, 2001, the plaintiff liquidated its assets in the fund for a steep loss. The plaintiff received $412,911 for its initial $1.5 million investment and $113,400 for its second $500,000 investment.

*Discussion.* 1. *Plaintiff's securities claim.* On appeal, the plaintiff argues: (a) the judge improperly allowed the defendants to introduce evidence of Marram's investment experience, the plan's other investments, and Kobrick's investment style; (b) the jury's verdict was markedly against the weight of the evidence; (c) the judge erred in precluding testimony from the plaintiff's expert; and (d) the judge erred in instructing the jury by not clearly distinguishing between actual and constructive knowledge, and by not instructing that Marram's sophistication as an investor was irrelevant to the plaintiff's securities claim. We address each of these claims in turn.

a. *Evidence of Marram's investment experience, the plan's other investments, and Kobrick's investment style.* The plaintiff contends that the judge erred in allowing the defendants to introduce evidence of Marram's investment experience because such testimony related to constructive knowledge and investor sophistication, both of which, the plaintiff claims, the Supreme Judicial Court found to be irrelevant to the securities claim. See *Marram I*, 442 Mass. at 53, 54 n.19. "We review a trial judge's evidentiary decisions under an abuse of discretion standard." *N.E. Physical Therapy Plus, Inc.* v. *Liberty Mut. Ins. Co.*, 466 Mass. 358, 363 (2013). Here, the judge's decision to admit the evidence of Marram's investment experience was not an abuse of discretion because the plaintiff offered and stipulated to evidence that Marram was an experienced and knowledgeable investor; thus, any additional evidence on that point was merely cumulative. On direct examination Marram testified that he taught entrepreneurship at Babson College, attended Harvard University's program for owners of companies, and had familiarity with the stock market. Moreover, the plaintiff stipulated to the admission into evidence of the subscription agreement, signed by Marram, which stated that Marram had "such knowledge and experience in financial and business matters that [he] is capable of evaluating the merits and risks of the [plan's] investment." In fact, the judge warned the plaintiff's trial counsel

that the broad scope of direct examination was "exposing [Marram] to so much cross-examination." Thus, the judge acted well within her discretion when she admitted evidence offered by the defendants on Marram's investment experience, given that such questioning was within the proper purview of cross-examination. See *Commonwealth* v. *DeJesus*, 44 Mass. App. Ct. 349, 352 (1998) ("[T]he scope of cross-examination rests largely in the sound discretion of the trial judge").

Further, evidence of the plan's other investments and Kobrick's prior investments in high technology stocks was offered to impeach Marram's testimony that he was seeking a more conservative investment strategy by pursuing the fund. "[T]he decision to admit impeachment evidence rests in the broad discretion of the judge and will not be disturbed on appeal unless the exercise of that discretion constituted an abuse of discretion or palpable error of law." *Commonwealth* v. *Oliveira*, 74 Mass. App. Ct. 49, 52 (2009). Given that the evidence of the plan's previous investments in speculative high technology stocks directly contradicted Marram's testimony that the plan was "conservative" and not interested in high technology stocks, we discern no abuse of discretion or error of law.

Moreover, even if the plaintiff's claims of evidentiary error were valid, those errors would not have been prejudicial, see G. L. c. 231, § 119, Mass.R.Civ.P. 61, 365 Mass. 829 (1974), because the jury failed to find that the defendants had made any misrepresentations at all; therefore, the jury never reached the question of whether Marram, as trustee of the plan, knew of the falsity of any alleged misrepresentations. See *Marram I, supra* at 52 (to prevail on a claim for misrepresentation under the securities act, the plaintiff must establish that the defendant made an "untrue statement of material fact . . . [and] the plaintiff did not know of the untruth" [quotation and citation omitted]). The plaintiff contends that the evidence of Marram's investment experience was admitted in error because it relates to constructive knowledge,[6] which is irrelevant, as actual knowledge is required. Although the plaintiff is correct in stating that a plain-

---

[6]The plaintiff argues that the evidence of Marram's investment experience may have caused the jury to find that Marram was a sophisticated investor and therefore should have known that the defendants' statements were untrue.

tiff's investment sophistication and the issue of constructive notice are irrelevant to establishing the elements of the securities claim, see *Marram I,* 442 Mass. at 53, 54 n.19, the jury never reached the issue of whether "the plaintiff did not know of the untruth," because the jury decided that the defendant did not make "any untrue statement of a material fact." *Id.* at 52. Therefore, even if such evidence was admitted in error, there was no prejudice to the plaintiff.

b. *Sufficiency of the evidence.* The plaintiff contends that there was evidence that Kobrick misrepresented the fund's leverage and his investment strategy and that no rational jury could have found otherwise. The plaintiff claims that in the PowerPoint presentation during the parties' December, 1999, meeting, Kobrick made a preinvestment misrepresentation that the fund was to "[u]tilize moderate leverage: typical leverage long and short 1.1 to 1.4." Kobrick testified that this statement meant that the fund's objective typically was to be leveraged ten percent to forty percent long and ten percent to forty percent short, with combined leverage under eighty percent. The plaintiff argues that because the fund's combined leverage in certain months prior to the plan's investment was over eighty percent, no rational juror could have concluded that Kobrick accurately represented his investment objectives. However, the evidence at trial supports the jury's finding that Kobrick made no misrepresentation. For example, a trial exhibit summarized the fund's long and short leverage for each month from 1998, when it became operational, through December 31, 1999, just before the plan's investment. This exhibit showed that the fund's combined long and short leverage never exceeded eighty percent in 1998 and exceeded eighty percent in only three months in 1999. Therefore, this exhibit — to which the plaintiff stipulated — showed that it was indeed typical for the fund's combined leverage to be under eighty percent.

The plaintiff also argues that, in the same PowerPoint presentation described above, Kobrick claimed to invest in companies based on an investigation of each company's management and that such claims amounted to a misrepresentation because of the fund's frequent level of trading and day trading.[7] However,

---

[7]"Day trader" is defined as "a speculator who seeks profit from the intraday fluctuation in the price of a security or commodity by completing double

Kobrick testified that there was no inconsistency between frequent trading positions in a particular company to maximize gains and the fundamentals of initially selecting that company's stock. Moreover, the offering memorandum stated that "[t]he investment strategy of the Fund will involve the taking of frequent trading positions." Thus, contrary to the plaintiff's assertions, the jury's verdict was well supported by the evidence.

c. *Plaintiff's expert witness.* The plaintiff claims error in the trial judge's decision to "preclude" the testimony of the plaintiff's expert, E. Stephens Scales. The judge, however, did not preclude Scales from testifying; after voir dire, she deferred a final decision on his qualification until the conclusion of Kobrick's testimony. Ultimately, the plaintiff never called Scales to testify. The plaintiff contends that it was justified in concluding that Scales would not be allowed to testify because the judge deemed Scales not qualified to testify as to the issue for which he was offered, namely, the fund's preinvestment trading activity, thus chilling the plaintiff's decision to call Scales as a witness.

Even if the judge had precluded Scales from testifying, such a decision would not constitute an abuse of discretion or other error of law. See *Palandjian* v. *Foster*, 446 Mass. 100, 104 (2006) ("The decision to exclude expert testimony rests in the broad discretion of the trial judge and will not be disturbed unless the exercise of that discretion constitutes an abuse of discretion or other error of law"). During voir dire, Scales testified he was a former stock broker who had worked for various brokerage firms for over twenty years. Scales also revealed that he had never testified in any court as an expert witness; he had never managed any kind of investment fund, including a hedge fund; and he had no present license relating to securities since his broker's license had expired when he retired in 2003. "The crucial issue in determining whether a witness is qualified to give an expert opinion is whether the witness has sufficient education, training, experience and familiarity with the subject matter of the testimony." *Matter of the Trusts Under the Will of Crabtree*, 449 Mass. 128, 152 (2007) (quotations and citation omitted). Given Scales's lack of expertise in investment and

trades of buying and selling or selling and covering during a single session of the market." Merriam-Webster's Collegiate Dictionary 318 (11th ed. 2005).

hedge funds, if the judge had precluded Scales from testifying, we would conclude that the judge had not abused her discretion or committed an error of law.

d. *Jury instructions.* The plaintiff argues the judge erred in instructing the jury by (1) not clearly distinguishing between actual and constructive knowledge, and (2) not instructing that Marram's sophistication as an investor was irrelevant. "When reviewing jury instructions to which there has been an objection, we conduct a two-part test: 'whether the instructions were legally erroneous, and (if so) whether that error was prejudicial.' " *Kelly* v. *Foxboro Realty Assocs., LLC,* 454 Mass. 306, 310 (2009), quoting from *Masingill* v. *EMC Corp.,* 449 Mass. 532, 540 n.20 (2007).

The plaintiff correctly notes that in *Marram I,* 442 Mass. at 54 n.19, the Supreme Judicial Court held that the plaintiff's constructive — as opposed to actual — knowledge, if any, of the falsity of any alleged misrepresentation is irrelevant to its claim. Accordingly, the judge so instructed the jury:

> "The plaintiff may not recover if the [plaintiff] actually knew the misrepresentation was false. . . . [a]ctual knowledge is required. The plaintiff must have actual knowledge that the misrepresentation was not — was untrue. It is not enough for you to determine that the plaintiff should have known that it was untrue. You must find that the plaintiff actually knew that the misrepresentation was untrue."

The judge clearly instructed the jury that actual knowledge was required. Contrary to the plaintiff's assertion, the judge's instruction was consistent with the Supreme Judicial Court's decision in *Marram I,* and therefore correct.

As to the plaintiff's second claim of error, although the plaintiff correctly notes that evidence of a plaintiff's investment sophistication is not relevant to proof of the securities claim, see *Marram I, supra* at 53, "[e]very possible correct statement of law need not . . . be included in jury instructions if the instructions as given are correct and touch on the fundamental elements of the claim." *Kobayashi* v. *Orion Ventures, Inc.,* 42 Mass. App. Ct. 492, 503 (1997). (Such evidence however remains

relevant and admissible for other purposes, e.g., as discussed above, for impeachment.) Further, even if it was error for the judge to decline such an instruction, there was no prejudice to the plaintiff because, as noted above, the jury never reached the question of knowledge. See G. L. c. 231, § 119; Mass.R.Civ.P. 61.

2. *Plaintiff's c. 93A claim.* The plaintiff argues that the judge's decision in favor of the defendants on the plaintiff's c. 93A claim is not supported by the evidence of both the pre-investment and postinvestment misrepresentations.[8] This argument is unpersuasive.

As discussed introductorily, after the jury found for the defendants on the plaintiff's securities claim, the judge found for the defendants on the plaintiff's c. 93A claim. In reviewing a matter wherein the trial judge was the finder of fact, "[t]he findings of fact . . . are accepted unless they are clearly erroneous[] [and] [w]e review the judge's legal conclusions de novo." *T.W. Nickerson, Inc.* v. *Fleet Natl. Bank,* 456 Mass. 562, 569 (2010) (citations omitted). See Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996) (rule 52[a]). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Springgate* v. *School Comm. of Mattapoisett,* 11 Mass. App. Ct. 304, 309-310 (1981), quoting from *United States* v. *United States Gypsum Co.,* 333 U.S. 364, 395 (1948). Moreover, "[i]n applying the 'clearly erroneous' standard, rule 52(a) requires that 'due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.' " *Demoulas* v. *Demoulas Super Mkts., Inc.,* 424 Mass. 501, 509 (1997). Therefore, "[s]o long as the judge's account is plausible in light of the entire record, an appellate court should decline to reverse it." *Id.* at 510.

As to the alleged preinvestment misrepresentations,[9] the judge

_____

[8]The plaintiff raised this argument in its motion to amend the findings. Mass.R.Civ.P. 52(b).

[9]As noted previously, these misrepresentations were: (i) the fund was a suitable investment for the plan, (ii) the fund was diversified and invested in variety of industries, (iii) the stock of high technology companies did not constitute a majority of the fund's holdings, and (iv) the fund would not be a volatile investment.

found, similar to the jury, that the defendants made no preinvestment misrepresentations. Specifically, the judge discredited Marram's testimony that Kobrick made the alleged misrepresentations because Marram's testimony was impeached by other evidence. For example, although the plaintiff asserts that Kobrick misrepresented the fund's volatility, the offering memorandum disclosed that the fund was "SPECULATIVE" and involved a "HIGH DEGREE OF RISK." Moreover, the judge credited Kobrick's testimony that he never stated the fund was "suitable" for the plan. The judge also noted that Marram conceded that he had never asked Kobrick how much of the fund constituted high technology stocks. "[T]he judge's assessment of the quality of the testimony is entitled to our considerable respect because 'it is the trial judge who, by virtue of [her] firsthand view of the presentation of evidence, is in the best position to judge the weight and credibility of the evidence.' " *Edinburg* v. *Edinburg*, 22 Mass. App. Ct. 199, 203 (1986), quoting from *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977).

The judge also found that Kobrick made no postinvestment misrepresentations. In her conclusions of law, the judge stated that the "inescapable conclusion . . . is that the Plan remained invested in the Fund not because of Kobrick's promises or assurances, but because it hoped that the downturn in the stock market would resolve itself and provide the Plan with future positive returns." Like her decision regarding the lack of preinvestment misrepresentation, the judge discredited Marram's testimony since it was contradicted by other evidence. For example, contrary to the plaintiff's assertion that no new money was invested in the fund, the fund actually received almost $24.5 million in new investments during 2000.

In sum, the plaintiff's argument that the judge's decision on the plaintiff's c. 93A claim is not supported by the evidence rests heavily on Marram's testimony, which the judge specifically discredited. "The judge's advantage in weighing the testimony is particularly evident in a case involving conflicting testimony, 'one in which widely differing inferences could be drawn from the evidence,' and the drawing of inferences cannot be separated from the evaluation of the testimony itself." *Demoulas*

v. *Demoulas Super Mkts., Inc.*, *supra* at 510, quoting from *Goddard* v. *Dupree*, 322 Mass. 247, 248 (1948). "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Edinburg* v. *Edinburg*, *supra* at 203, quoting from *Anderson* v. *Bessemer City*, 470 U.S. 564, 574 (1985). As the plaintiff has not demonstrated that any of the judge's findings are clearly erroneous, and as those findings support the judge's ruling on the c. 93A claim, we reject the plaintiff's argument that the judge's ruling is not supported by the evidence.

3. *Defendants' counterclaim for legal fees.* In their counterclaim for breach of contract, the defendants sought to recover legal fees under section VIII(D) of the subscription agreement (indemnification clause).[10] Before trial, the motion judge granted the plaintiff's motion for summary judgment on the defendants' counterclaim, ruling that both subsections (a) and (b) of the indemnification clause were unenforceable as against public policy.

"An order granting or denying summary judgment will be upheld if the [motion] judge ruled on undisputed material facts and his ruling was correct as a matter of law." *Anderson St. Assocs.* v. *Boston*, 442 Mass. 812, 816 (2004), quoting from *Commonwealth* v. *One 1987 Mercury Cougar Auto.*, 413 Mass. 534, 536 (1992). We see no error in the grant of summary judgment because the specific ground for legal fees advanced by the defendants in this case directly contradicts the decision in *Marram I.*

a. *Subsection (a) of indemnification clause.* Subsection (a) of the indemnification clause holds the plaintiff liable for the defendants' legal fees arising out of "any false representation or

---

[10]We note that the record before us contains the defendants' "Answer, Affirmative Defenses and Counterclaims," dated September 2, 2004, which appears to make no mention of the defendants' claim for legal fees under the indemnification clause. From the motion judge's decision, we infer that the defendants may have made such a claim in a subsequent complaint; the motion judge's memorandum of decision states that the defendants "through Counterclaims, a Third-Party Complaint, and a separate Complaint . . . have brought a number of claims against the [plaintiff]." In spite of its apparent absence from the record, we address the defendants' claims for legal fees under the indemnification clause.

warranty or breach or failure by the [plaintiff] to comply with any covenant or agreement made by the [plaintiff] herein." The motion judge concluded that, pursuant to this subsection, even if the defendants had made misrepresentations sufficient to constitute a securities act violation, the plaintiff would have to still pay the defendants' legal fees and thereby "lose by winning." The judge reasoned that such a result would "fly in the face" of the Supreme Judicial Court's decision in *Marram I.* Based on *Marram I* and the securities act's strong protections for buyers of securities, the motion judge determined that it would be "contrary to public policy and to the legislative purpose and spirit of the [securities act] to enforce provisions in the Subscription Agreement which would permit the [defendants] to recover damages even if they committed a violation of the act." We agree.

In their counterclaim, the defendants alleged that the plaintiff breached the subscription agreement by bringing a securities act claim based on *oral* misrepresentations because the plaintiff had warranted in the subscription agreement that it had relied solely on *written* documents in deciding whether to invest.[11] Based on this alleged breach, the defendants sought legal fees pursuant to subsection (a) of the indemnification clause, which states the plaintiff is liable for litigation expenses arising out of "any false representation or warranty . . . made by the [plaintiff]" in the subscription agreement.

The defendant's breach of contract counterclaim is in direct conflict with *Marram I,* as that decision expressly allowed the plaintiff's securities claim to proceed based on alleged oral representations. In *Marram I,* 442 Mass. at 55-57, the Supreme Judicial Court determined that a claim under G. L. c. 110A, § 410(a)(2), may proceed based on oral misrepresentations

---

[11]The defendants' allegation rests on two provisions in the subscription agreement. The first, the agreement's integration clause, states: "This Subscription Agreement constitutes the entire arrangement and understanding between the parties hereto regarding its subject matter, and supersedes any prior or contemporaneous agreements, arrangements and understandings, written or oral, between the parties regarding the same." The second, a provision in the "Representations and Covenants of the Investor" section of the subscription agreement, states: "The Investor acknowledges that in making a decision to subscribe for Shares the Investor has relied solely upon the Memorandum [and] the other Fund Documents."

despite a contractual integration clause.[12] Thus, the defendants cannot claim a breach of the subscription agreement by the plaintiff because the plaintiff proceeded with the very claim allowed by *Marram I*.

We now know that the plaintiff's securities claim was unsuccessful at trial. However, theoretically, from the perspective of the motion judge, if the plaintiff had succeeded on its securities claim, but the defendants' counterclaim for breach of contract also was successful, under the literal terms of subsection (a) of the indemnification clause, the plaintiff would be liable for the defendants' legal fees. Thus, the motion judge correctly observed that if the defendants prevailed on their counterclaim for breach of contract, it was possible for the plaintiff to "lose by winning."

As the defendants' breach of contract counterclaim based on subsection (a) of the indemnification clause sought to hold the plaintiff liable for its breach of the subscription agreement without limitation as to the defendants' violation of the securities act, even though G. L. c. 110A, § 410(*f*), would ultimately bar the defendants from recovering under subsection (a) if the plaintiff's securities claim was successful, the defendants' counterclaim was still untenable. Consequently, the motion judge was correct in granting summary judgment on the counterclaim insofar as it rested on subsection (a), as *Marram I* foreclosed the defendant's argument for indemnification based on the plaintiff's alleged breach of contract.

b. *Subsection (b) of the indemnification clause.* Subsection (b) holds the plaintiff liable for the defendants' legal fees arising out of "any action for securities law violations instituted by the [plaintiff] which is finally resolved by judgment against the [plaintiff]." Once again, the motion judge determined that this subsection of the indemnification clause was unenforceable as against public policy. We agree.

Whether the enforcement of such an indemnification clause

---

[12]The court also noted that in light of its conclusion that an integration clause cannot release the defendants from liability under G. L. c. 110A, § 410(*a*)(2), the court "need not consider further the defendants' argument that, in acknowledging in writing that [the plaintiff] had read and understood the integration clause, [the plaintiff] wrongfully brought claims based on Kobrick's oral statements." *Marram I, supra* at 57 n.23.

violates public policy remains an issue of uncertainty in Massachusetts, given the dearth of appellate guidance on this issue. We may, however, turn to Federal case law interpreting the Federal Securities Act of 1933. See *Marram I*, 442 Mass. at 50-51. See also G. L. c. 110A, § 415 (stating that "chapter [110A] shall be so construed as . . . to coordinate the interpretation and administration of this chapter with the related federal regulation").

Despite the defendants' contention that the Federal courts are in agreement that such clauses do not violate public policy, the Federal District courts are divided on the issue. Compare *Doody* v. *E.F Hutton & Co.*, 587 F. Supp. 829, 833 (D. Minn. 1984) (*Doody*) ("The Court finds that enforcing an indemnity provision . . . would discourage prospective plaintiffs from bringing securities fraud actions whenever there is an integration clause in a subscription agreement . . . because the plaintiffs would be running the risk of incurring substantial liability for attorneys' fees and costs"), with *Zissu* v. *Bear, Stearns & Co.*, 627 F. Supp. 687, 692-694 (S.D.N.Y.) (*Zissu I*) ("Enforcing the indemnification provision . . . need not deter . . . investors from bringing suits to enforce their rights under the securities laws. The only potential chilling effect is on those investors who make representations in a subscription agreement which they later repudiate. . . . Where an investor repudiates warranties previously made for the purpose of bringing a suit, enforcement of the indemnification clause comports with existing policies of the securities laws"), aff'd on other grounds, 805 F.2d 75, 78-80 (2d Cir. 1986) (*Zissu II*);[13] *Barnebey* v. *E.F. Hutton & Co.*, 715 F. Supp. 1512, 1522 (M.D. Fla. 1989) (rejecting

---

[13]In *Zissu II, supra*, and *Layman* v. *Combs*, 994 F.2d 1344 (1992), the courts did not address the public policy implications of the indemnification clauses at issue because they found that the clauses lacked the requisite specificity to hold the plaintiff liable for the defendant's attorney's fees. Although neither reached the question of whether such indemnification clauses violate public policy, as the specificity issue was dispositive in both cases, such a conclusion regarding specificity would be inconsistent with a determination that the indemnification clauses are unenforceable. As the court noted in *In re: Integrated Resources Real Estate Ltd. Partnerships Sec. Litigation*, 815 F. Supp. 620, 677-678 (S.D.N.Y 1993): "The public policy argument — that enforcing such agreements would discourage legitimate securities fraud actions — is too absolute. Where possible, the securities laws should not be

*Doody, supra,* and "find[ing] the reasoning of [*Zissu I, supra,*] to be more persuasive on the issue of public policy").

We note that under Massachusetts law, courts must proceed with caution when determining whether a contract must be voided due to public policy. See *Miller* v. *Cotter,* 448 Mass. 671, 683 (2007) ("[C]ourts are hesitant to invalidate contracts on . . . public policy grounds . . . . The grounds for a public policy exception must be clear in the acts of the Legislature or the decisions of this court"). Nonetheless, in our view, the motion judge properly concluded that the enforcement of a "loser pays" indemnification clause in the securities fraud context is against public policy because, as *Marram I,* 442 Mass. at 51-54, made clear, the securities act is highly protective of buyers of securities. Cf. *Huffington* v. *T.C. Group, LLC,* 685 F. Supp. 2d 239, 243 (D. Mass. 2010), aff'd, 627 F.3d 18 (2011). We recognize, however, that in *Marram I, supra* at 44, the indemnification clause was neither raised nor discussed, and the court's decision was limited to the review of a grant of a motion to dismiss. Still, we determine that, in interpreting and analyzing the elements for a claim under G. L. c. 110A, § 410(*a*)(2), *Marram I* made clear that Massachusetts public policy is protective of investors. See *Welch* v. *Barach,* 84 Mass. App. Ct. 113, 119 (2013), quoting from *Marram I, supra* at 51 ("An important purpose of § 410(*a*)(2) is the creation of a 'strong incentive for sellers of securities to disclose fully all material facts about the security' and of a 'heightened deterrent' against misrepresentation and omission").

Thus, Massachusetts policy seems at odds with those Federal courts that have upheld indemnification clauses under the Federal securities act. For example, the leading Federal court case for the proposition that indemnification clauses do not violate the public policy of the Federal securities act is *Zissu I.* In that case, the plaintiff lost on his Federal securities act claims and the defendants prevailed on their counterclaim for breach of warranty. *Zissu I,* 627 F. Supp. at 689, 690-691. The breach of

construed against freedom of contract. *Nor would the statement in Zissu II that a higher level of specificity would be required make sense if such indemnity clauses could not be enforced altogether*" (emphasis supplied) (footnote omitted).

warranty counterclaim asserted that the plaintiff's lawsuit for securities fraud was based on allegations that were contrary to the plaintiff's representations in the parties' subscription agreement; specifically, the plaintiff's representations that he understood the investment was speculative with a high degree of risk, that he was not relying on any representations other than those in the private offering memorandum, that he had carefully reviewed that memorandum and the subscription agreement, and that he was capable of calculating the risks of the investment. *Id.* at 692-693. When the defendants in *Zissu I* prevailed on their counterclaim for breach of warranty, which is comparable to the defendants' counterclaim for breach of contract in the case before us, the *Zissu I* defendants were awarded attorney's fees under the indemnification provision in the parties' agreement. *Zissu I, supra* at 690-691. The *Zissu I* plaintiff filed a motion for judgment notwithstanding the verdict, arguing that enforcement of the indemnification clause violated public policy because it would discourage investors from bringing claims. *Id.* at 692-693. The Federal District Court judge disagreed and found that the indemnification clause did not violate public policy and that any chilling effect was desirable and appropriate. He stated:

> "The only potential chilling effect is on those investors who make representations in a subscription agreement which they later repudiate. It would discourage such investors from using their own fraudulent conduct in order to bring unjustified lawsuits."

*Id.* at 693. As the motion judge in the case before us noted, citing to *Marram I,* "the very claims that, according to *Zissu [I],* never should have been brought are claims that state a cause of action under G. L. c. 110A, § 410($a$)(2)." In *Marram I,* 442 Mass. at 55, the court specifically rejected the defendants' argument they were "immune from the plaintiff's claims because . . . Marram's sophistication and equal bargaining power are relevant to the applicability of the integration clause."

Further, in *Zissu I,* 627 F. Supp. at 693, the judge went on to state that "not only is enforcement of this indemnification clause not contrary to securities law policies, but the securities laws

authorize courts to award attorneys' fees on these facts." In support of this statement, the judge noted that "[s]ection 11(*e*) of the 1933 [Securities] Act[, 15 U.S.C. § 77k(*e*),] provides that courts may award costs and reasonable attorneys' fees if the plaintiff's suit is without merit." *Ibid.* In contrast, as noted by the motion judge in the case before us, the Massachusetts securities act has no such corresponding provision.[14] In fact, under the Massachusetts act, only the plaintiff investor may be awarded attorney's fees and only if the plaintiff prevails. G. L. c. 110A, § 410(*a*)(2).

Consequently, it appears that Massachusetts public policy aligns with the public policy of the Federal securities act advanced by those Federal District Courts that have refused to enforce indemnification provisions. For instance, in *Doody*, 587 F. Supp. at 831, the defendant seller of securities advanced counterclaims nearly identical to those advanced in this case, namely, that the plaintiffs breached their warranties by suing the defendant for securities fraud based on oral misrepresentations. Like the present case, the plaintiffs in *Doody* "warranted, at the time of entering into the transactions, that they were not relying on any representations other than those contained in the prospectus." *Ibid.* Thus, like the defendants here, the defendants in *Doody*, claimed they were entitled to attorney's fees and costs because the plaintiffs breached their warranties. See *ibid.*

However, unlike *Marram I*, *Doody* addressed both the indemnification clause and the integration clause. Ultimately, the court in *Doody*, *supra* at 833, determined that the indemnification provision was unenforceable as it violated public policy:

> "The Court finds that enforcing an indemnity provision such as the one in the instant action would discourage prospective plaintiffs from bringing securities fraud actions whenever there is an integration clause in a subscription agreement. Prospective plaintiffs would be discouraged because the plaintiffs would be running the risk of incurring substantial liability for attorneys' fees and costs.

---

[14]We note that under G. L. c. 231, § 6F, a court may assess reasonable attorney's fees against a party when all or substantially all of its claims and defenses are wholly insubstantial, frivolous, and not advanced in good faith. However, this provision is not part of the Massachusetts securities act.

> *Since the securities laws are a remedial measure intended to encourage the prosecution of securities fraud actions, the Court refuses to enforce this indemnity provision*"
> (emphasis supplied).

The Supreme Judicial Court cited a segment of this exact language in *Marram I*, 442 Mass. at 57, as support for the proposition that an integration clause "cannot be construed to waive the plaintiff's rights under Federal or State securities law." Importantly, the public policy relied on by the *Doody* court to hold the indemnity provision unenforceable is similar to the public policy of the Massachusetts securities act as expressed in *Marram I*. In *Marram I*, *supra* at 51, the court noted that "[t]he statute's thrust is both 'redressive' and 'preventive[,]' . . . [and] it creates a strong incentive for sellers of securities to disclose fully all material facts about the security." Likewise, the *Doody* court, in holding that the indemnity clause was unenforceable, noted that "securities laws are a remedial measure intended to encourage the prosecution of securities fraud actions." *Doody*, *supra*.

Further, in *Huffington* v. *T.C. Group, LLC*, 685 F. Supp. 2d at 244, the United States District Court for the District of Massachusetts refused to nullify a contractual forum selection clause on public policy grounds because, "[w]hile the [*Marram I*] opinion does reflect the Massachusetts public policy of protecting investors, that policy is not implicated by forcing Huffington to litigate in Delaware." By contrast, in this case, the parties' indemnification clause, which holds the plaintiff liable if it loses its securities claim, *does* implicate the public policy of protecting investors. As the motion judge in the case before us stated, such "loser pays" indemnification clauses "would discourage all but the most confident investors from invoking the protection of the Act."

*Conclusion.* For the reasons discussed above, we affirm the judgment and the orders denying the plaintiff's posttrial motions.

*So ordered.*